Filed 6/21/23  P. v. McGirt CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B320579 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA078789) |
| v. | |
| LAWRENCE JAMAAL McGIRT, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Alan Z. Yudkowsky, Judge.  Affirmed as modified.

Heather J. Manolakas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Stephanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Lawrence Jamaal McGirt, hereinafter, defendant, contends the trial court erred in denying his motion to take judicial notice of two federal court orders in a class action lawsuit in which he was a member, and by admitting testimony he claims was character evidence. Defendant adds that cumulative prejudice from these errors requires reversal. Defendant also contends, and the People agree, the trial court erred in staying the great bodily injury enhancement in count 3, battery by a prisoner on a non-confined person. We modify the order staying the enhancement but finding no merit to defendant's other contentions, we otherwise affirm the judgment.

## BACKGROUND

Defendant was charged with six felony counts alleging offenses occurring on two occasions while he was confined in California State Prison. In count 3 it was alleged defendant committed battery by a prisoner on a non-confined person, Officer M. Morataya, and count 4 alleged battery by a prisoner on a non-confined person, Officer L. Martinez, in violation of Penal Code section 4501.5.[1] It was also alleged as to count 3 that defendant personally inflicted great bodily injury upon Officer M. Morataya within the meaning of section 12022.7, subdivision (a); and under

---

[1] All further unattributed code sections in this section are to the Penal Code unless otherwise stated.

Counts 1 and 2 allege an assault on December 3, 2019, by a life prisoner by means likely to produce great bodily injury, in violation of section 4500 upon Officer M. Morataya and upon Officer L. Martinez, respectively. Defendant's motion pursuant to section 995 was granted in part, and counts 1 and 2 were dismissed prior to trial.

2

section 667, subdivision (a)(1) that defendant had suffered three serious or violent felonies as defined in sections 667, subdivision (d) and 1170.12, subdivision (b).  Count 5 alleged attempted battery by a prisoner on a non-confined person, Officer A. Rodriguez, in violation of sections 664/4501.5, on August 19, 2020; and count 6 alleged battery by a person confined in a local detention facility upon a peace officer, Officer P. Castellanos, in violation of section 243.9, subdivision (a), also on August 19, 2020.  It was alleged the three prior convictions were serious or violent felonies under the Three Strikes Law, section 667, subdivisions (b)-(j) and section 1170.12.

A jury found defendant guilty of counts 3, 4, and 6 as charged, and found true the allegation that defendant personally inflicted great bodily injury upon Officer Morataya.  The jury was unable reach a verdict on count 5, that was then dismissed.

At the May 18, 2022 sentencing hearing, defendant waived jury trial on the allegations of prior convictions.  The trial court struck two allegations pursuant to section 1385, and defendant admitted he suffered a prior robbery conviction in 2014.  The court dismissed the two serious felony enhancements and stayed the great bodily injury enhancement, and sentenced defendant to six years in prison comprised of the low term of two years for counts 3 doubled to four years as a second strike, and one year (one-third the midterm) as to each of counts 4 and 6, doubled to two years as a second strike.  The court stayed the term imposed as to count 6 pursuant to section 654.

Defendant filed a timely notice of appeal from the judgment.

3

**Prosecution evidence**

*Counts 3 and 4*

On December 3, 2019, Correctional Officers Milton Morataya and Lanny Martinez were monitoring inmates in a housing unit at the California State Prison in Los Angeles County. The unit held 200 inmates and it was almost full. Officer Sommer Davis, was also present in the control booth. Officers Morataya and Martinez were armed with batons and pepper spray. Officer Davis had a firearm and sponge rounds launcher in the control booth.

At approximately 8:15 a.m., 20 or 30 inmates were out of their cells getting medication, and being monitored as they entered the day room from the medication line outside, when defendant was observed to be attempting to use a telephone, that was not allowed until 9:00 a.m. and then only for those inmates who had signed up the preceding night. Officer Davis discovered defendant had lost phone privileges as discipline for a rules violation, so Officer Morataya ordered defendant to return to his cell.

Defendant ignored the order, continued to try to use the phone and gave no indication he was listening to the officers. Speaking louder, Officer Morataya said defendant's name and again gave the order. Defendant replied, "I'm not talking to you. I'm talking to Davis." Officer Davis said she was too busy to talk to him. Officer Martinez also told defendant to go back to his cell, but was ignored by defendant.

When Officers Morataya and Martinez approached defendant, he took a rigid stance, clenched his fists, looked angry, and said, "Don't come up on me like that." Officer Morataya told defendant to turn around and submit to handcuffs. When defendant failed to comply, a second order to submit to handcuffs was given. Defendant began to comply, turned around, and put his hands

4

behind his back. When Officer Morataya grabbed defendant's wrist with one hand and reached for the handcuffs with the other, defendant said, "Fuck this shit," spun to his left, swung his left elbow upward, and while looking directly at Officer Morataya's face, struck the officer in the nose. The officer felt excruciating pain, was dazed, and his eyes became watery. Both Officers Morataya and Martinez then forced defendant to the floor, intending to stop the threat. Neither officer punched defendant during the struggle. Nor did they use their batons or pepper spray. Officer Davis radioed a report of a resisting inmate, hit the alarm, and let the responding staff enter through the back door. She also followed protocol by getting out leg restraints.

In the fracas Officer Morataya's arm became stuck under defendant's body, and due to body weight, he was trapped. As a result, Officer Morataya experienced pain in his shoulder and thumb. The struggle continued with defendant twisting and attempting to again elbow Officer Morataya, who moved his face and dodged a hit, resulting in defendant's elbow stricking Officer Martinez in the face. Defendant then tucked his arms under his body, preventing the officers from getting control.

Officer Schneider had responded and was able to pull out defendant's left arm. Officer Martinez then got defendant's right arm, and Officer Morataya placed defendant in handcuffs. Defendant then stopped resisting and was escorted out of the building. Officer Morataya went first to the prison's medical facility for evaluation. He was then sent to an outside clinic where he was treated for his broken and twisted nose, swelling of his face and left eye, and a black eye. It took two months for his nose and thumb to heal. He had surgery on his left shoulder two months before the April 2022 trial, and remained unable to return to work. Officer

5

Martinez suffered swelling, pain and redness on his left cheekbone, as well as swelling and pain to his left knee. Defendant had a bloody nose.

Officers Morataya, Martinez, and Davis each testified they were unaware of any lawsuits or complaints brought by or in which defendant was involved.

### *Count 6*

Correctional Officer Armando Rodriguez was a floor officer in a maximum-security disciplinary unit housing inmates who had committed rules violations. His duties included escorting hand cuffed inmates to and from showers, medical appointments, and the exercise yard. It was considered a dangerous unit for both inmates and staff, and the officer's job was to keep both safe from attack. Officer Rodriguez had been assaulted numerous times. He had been kicked, subjected to headbutts, and had bodily fluids including spit thrown at him.

On August 19, 2020, defendant was handcuffed and Officer Rodriguez was escorting him to or from a medical appointment. Defendant began to walk fast and Officer Rodriguez told him to slow down. Defendant complied. When they entered a small rotunda or hallway of the building, without warning, defendant became aggressive. Defendant entered first and faced away from Officer Rodriguez. Defendant then turned, and aggressively leaned or lunged toward the officer who stepped to the side to avoid being headbutt. The officers pushed defendant away and defendant collided with the wall. Officer Rodriguez, who was armed with a baton and pepper spray, did not think they were necessary to stop the threat and did not use them. Instead, he activated his alarm and held defendant against the wall while defendant resisted by

6

attempting to pull away.  Officer Rodriguez ordered defendant to stop resisting.

When Officer Pedro Castellanos responded, he found Officer Rodriguez with both hands against defendant's upper back.  Sergeant Phillip Doty, and Officer Castellanos arrived and took over from Officer Rodriguez.  Defendant was medically evaluated, and found to have nothing beyond abrasions and redness with no active bleeding.  He was then returned to his cell.

As defendant entered his cell, he turned suddenly and spit toward Officer Castellanos's face, hitting the left side of the protective shield.  Officer Castellanos who had turned his head, was hit by some of defendant's saliva on his face.  A medical check found no ill effect.

Though they have since been installed, at that time there were no cameras in the areas where defendant was housed.

Officers Rodriguez, Castellanos, and Doty all testified they were unaware of any lawsuits or complaints brought by defendant or in which defendant was involved.  Rodriguez however testified to being familiar with a lawsuit related to disabled inmates and mentally ill inmates at the prison.

**Defense evidence**

### *The December 3, 2019 incident*

Defendant testified he had been transferred from another prison five days earlier.  When he attempted to use the dayroom phone, he thought it was allowed since he had signed up the previous day.  He dialed but did not get through, so he tried to speak to Officer Davis about signing up for the next day, but was not able to get her attention.  Officers Morataya and Martinez approached him aggressively and said he could not use the phone, and to turn around and cuff up.  Defendant claims he complied, that

7

Officer Morataya cuffed both hands, and then slammed defendant to the ground. Defendant denied pulling away when Officer Morataya grabbed his wrists before putting on the cuffs, and claimed when he was on the ground, they started beating him. Defendant remembered his body hitting the ground and being punched in the face by both officers countless times. Still, he did not resist. Other officers responded, shackled him and took him to the rotunda, where they slammed him to the ground and kicked him in the head. More officers came and assaulted him further. He was then taken to the gym, and on the way, Officer Morataya grabbed his shirt and started to choke him. In the gym, he was put in a cage where, feeling dizzy, he sat down, and a nurse came to see him. His shirt, pants and boots were covered with blood and he had contusions and knots on his head.

Defendant testified that except for in the visitors' room, there were no cameras in the facility then and no staff wore body cameras; but because of a lawsuit that has changed. Defendant testified he had complained about the correctional officers since being transferred there. The officers who hit him that day called him a "bitch" and told him to stop complaining. Defendant interpreted this as referring to his past complaints. Defendant filed a complaint about the incident on a 602 form, which falsely claims there would be no reprisals. Defendant was sent to administrative segregation for 14 months, and he was attacked again by Officers Morataya and Rodriguez.

### The August 19, 2020 incident

Defendant testified he was escorted by Officers Rodriguez and Lewis to a medical appointment. It was a two-officer security escort due to the previous allegations of assault against two officers, which defendant denied. As Officer Lewis started to bring defendant

back, Officer Rodriguez called defendant "bitch." When defendant returned the epithet, Officer Rodriguez slammed defendant against the wall and punched him in the face. Defendant assumed Officer Rodriguez was referring to the complaints defendant had made since "to bitch" means to complain, and defendant filed a lot of complaints. Defendant further testified Officer Rodriguez punched him in the face and spit in his eye. Officer Lewis then stopped Officer Rodriguez from assaulting defendant further. Officer King was first to respond and told defendant to calm down as he yelled, "Why are you hitting me like that?" Both told him not to do anything. At the time he was in shackles with a chain around the waist and one arm cuffed on the right and one on the left. Two other officers arrived and took him to the nurse. He had a laceration just below an eyebrow.

Officers Doty and Castellanos then escorted defendant to his cell, where Officer Castellanos laughed at him. Defendant claims to have responded, "Fuck you, Castellanos," whereupon Officer Castellanos ran into the cell and started punching defendant in the face. Defendant denied spitting on Officer Castellanos, and claims to have been in great pain. He was taken to the clinic treatment center where the nurse who was documenting his injuries, was told by the officers they were pre-existing and to not write it down. She followed their orders. Defendant believed the attacks were in retaliation for reporting what happened to him on December 3, and for filing grievances regarding his treatment.

On cross-examination, defendant was asked about a declaration regarding the December 3 incident which he submitted in April 2020 for filing in a federal class action lawsuit. In the declaration, defendant stated that Officers Morataya and Martinez immediately slammed him to the ground, and later handcuffed him

9

while beating him up. The declaration did not mention being handcuffed before he was on the ground or kicked in the head, although his testimony on direct examination was that he was cuffed first, while still standing. Defendant filed a federal lawsuit seeking money damages against the officers for his injuries.

Defendant acknowledged it would be harder to be paroled if he were convicted of committing crimes in prison. Though he could have, he did not request separation from any of the staff he accused of beating him.

Inmate Thomas Gadson testified that in 2018, he tried to commit suicide in a holding cage by hanging himself, and that Officer Castellanos sprayed him with pepper spray while calling Gadson by a racial epithet. Gadson filed a complaint against Officer Castellanos. Inmate Andrew Gatlin testified that he once saw Officer Rodriguez slam another inmate on the ground, and that Officer Rodriguez had retaliated against Gatlin and other inmates by slamming them onto the ground. Gatlin also testified that in 2019, Officer Rodriguez forced Gatlin to be strip searched in the yard where female guards were present.

Another inmate, Darnell Lemons, testified he was in his cell on December 3, 2019, and observed the incident regarding the telephone. He testified Officers Morataya and Martinez told defendant to turn around and cuff up, that he saw Officer Martinez slam defendant to the ground, and Officer Morataya then get on top of defendant. Lemons said Officer Martinez swung a fist to hit defendant, but missed and instead punched Officer Morataya in the left jaw or cheek area, but not his nose. A sergeant and other officers arrived and took defendant to the rotunda, where he saw defendant attacked while not resisting. Lemons told a defense

10

investigator before trial that he could not see what happened in the rotunda.

### *Rebuttal*

Department of Corrections investigator Donal Gaines inspected Lemons's cell and confirmed that one cannot see into the rotunda from the cell. Photographs which demonstrated the view were taken.[2] The investigator also interviewed defendant on video approximately four or five days after the August 20, 2020 incident. Still photos taken from video were produced. One shows defendant with redness above the right eyebrow. Despite defendant's testimony his face appeared to be caved in, no other injury is apparent in the photos. Nor do the photos show a black eye or a laceration on defendant's face.

Officer Castellanos testified he recalled having to rescue an inmate who was trying to hang himself in a holding cage, but did not remember details of the incident. He explained it was dangerous to get in a cell with an inmate, especially a holding cell, and pepper spray would be used in such rescues because it quickly stops the inmate and it is safer for the officer. Officer Castellanos denied shoving defendant into his cell on August 19, 2020, when he returned him. He would not do that because it is unsafe and illegal.

---

[2] The parties stipulated Lemons was interviewed on June 30, 2021, by a defense investigator, and told him, in part: "Supervisor Villalobos came and they escorted [defendant] to the rotunda. At this point Lemons could no longer see what they were doing to [defendant]. A couple of hours later, Lemons saw [defendant] being moved in the direction of administrative segregation D5 in a wheelchair."

11

Officer Rodriguez testified that during the times inmate Gatlin claimed he was assaulted by the officer, Gatlin was incarcerated in different prisons. Officer Rodriguez did not work in those other prisons and had never crossed paths with Gatlin.

## DISCUSSION

## I. Request for judicial notice

### A. *Evidence Code section 402 hearing and ruling*

After conducting a hearing pursuant to Evidence Code section 402,[3] the trial court denied defendant's motion in limine for judicial notice of two orders dated March 11, 2021 (the *Armstrong* orders), issued by the United States District Court for the Northern District of California in *Armstrong v. Newsome*, 94-CV-02307-CW, a class action lawsuit brought by disabled prisoners in which defendant claimed to be a class member. In particular, the motion sought to introduce the remedial measures ordered by the federal court in the two orders, including the installation of cameras, and the directive against retaliation against inmate class members, which defendant alleged was the motive for the assaults upon him on December 3, 2019 and August 19, 2020.

Also at the section 402 hearing, defense counsel argued he should be able to show the Department of Corrections and Rehabilitation (CDCR) was ordered to place cameras in facilities, to have officers use body-worn cameras, and to change their

---

[3] Evidence Code section 402 provides that when the existence of a preliminary fact necessary to the admissibility of evidence is disputed, its existence or nonexistence shall be determined in a hearing outside the presence of the jury.

All further unattributed code sections in the Discussion section are to the Evidence Code unless otherwise stated.

12

documentation and investigation process with regard to grievances, officer misconduct and retaliation of inmates. Defendant's counsel acknowledged the orders did not mention the officers involved in this case, but argued that due to the corrections by the *Armstrong* orders, a reasonable doubt of defendant's guilt could arise. The prosecutor argued that since the orders did not name specific officers or describe conduct specific to them but were instead generally directed toward all officers at the prison, the orders were not relevant to this case.

The trial court refused to take judicial notice of the facts and conclusions of law recited in the orders, as defendant had not made a showing of the preliminary facts sufficient to satisfy issues of relevance or issues arising under section 352.

### B. The trial court's discretion

"It is well recognized that the purpose of judicial notice is to expedite the production and introduction of otherwise *admissible* evidence." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 578 (*Mozzetti*), italics added.) Judicial notice may be taken of the records of any court of record of the United States. (§ 452, subd. (d).) Section 453 provides that a court must take judicial notice of any matters specified in section 452 so long as the moving party gives sufficient notice of the request and furnishes the court with sufficient information to enable it to take judicial notice. However, judicial notice may be taken only as authorized by law. (§ 450.) Thus, only relevant evidence is admissible. (§ 350.)

Nevertheless, defendant suggests the trial court was required under section 453 to take notice of the *Armstrong* orders solely because he gave the prosecution sufficient notice of his request and furnished the court with sufficient information. Providing sufficient information means "information *relevant* to (1) the propriety of

13

taking judicial notice of the matter and (2) the tenor of the matter to be noticed." (§ 455, subd. (a), italics added.) Thus, "[e]ven if a matter is a proper subject of judicial notice, it must still be *relevant*," as required by section 350. (*People v. Payton* (1992) 3 Cal.4th 1050, 1073, citing *Mozzetti, supra*, 67 Cal.App.3d at p. 578.) In addition, as provided in section 454, subdivision (a)(2), section 352 applies to the determination of "the propriety of taking judicial notice of a matter, or the tenor thereof." Even where evidence is shown to be relevant, section 352 allows the trial court the discretion to exclude it " 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Mozzetti, supra*, at p. 578.)

Thus, the information required of defendant to make judicial notice mandatory was that the evidence was admissible. Where admissibility of proffered evidence depends on the existence of a preliminary fact or facts, it is the burden of the proponent of the proffered evidence to produce evidence sufficient to sustain a finding of the existence of the preliminary fact. (§ 403, subd. (a)(1).) Here, the trial court found defendant had not met his burden to make a showing of the preliminary facts sufficient to satisfy issues of relevance or issues arising under section 352. On appeal, the trial court's rulings on both relevance and the admission of evidence under section 352 are reviewed for abuse of discretion (*People v. Battle* (2021) 11 Cal.5th 749, 799), which will not be disturbed "except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*Id.* at p. 800, internal quotation marks omitted.) In any appeal claiming an abuse of discretion, it is

14

defendant's burden to clearly establish both the abuse of discretion and a miscarriage of justice.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

### C. *Relevance and section 352 issues*

The trial court found defendant had failed to show the preliminary fact that the officers involved in the two incidents knew of the orders and knew of defendant's involvement in the litigation. Defendant makes no claim he made any offer to prove any such preliminary fact, but merely disagrees with the trial court and declares that the *Armstrong* orders were "extremely" relevant to his defense the correctional officers attacked him in retaliation for his involvement in the *Armstrong* lawsuit.  Defendant argues that the orders were key to this defense because they show the danger inmates such as he faced in prison due to retaliation for the *Armstrong* lawsuit.

Defendant's reasoning on this point rests in part on a claim that, in his words, "[t]he fact that the guards denied knowledge of the lawsuit only went to their credibility and ultimately the believability of appellant's defense, not its relevance."  As authority for this assertion, defendant cites section 210, which provides:  " 'Relevant evidence' " means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  Defendant acknowledges the *Armstrong* orders were issued on March 11, 2021, long after the events in this case took place; however, he points out that they "memorialize the history of the case and why prisoners like appellant would be the target of retaliation."

Defendant's reasoning appears to be that the *Armstrong* orders would have demonstrated the officers were lying when they

15

said they did not know about his involvement in the lawsuit; however, he fails to explain just how he might do so without any evidence the officers knew or even had reason to know about defendant's involvement in that litigation. Defendant also fails to cite any authority that suggests a witness's claim of ignorance may be countered solely by evidence of the matter they claim to know nothing about.

Defendant has made no offer to prove that the correctional officers involved in this case knew of defendant's involvement in the *Armstrong* case. His arguments amount to a claim he should have been allowed to prove the mental state of the officers involved in this case by arguing that CDCR correctional officers in general *might* know about the *Amstrong* litigation and *might* wish to retaliate against inmates due to resentment caused by the lawsuit. As neither logic nor authority support defendant's position, we agree with the trial court that he failed to show the orders were relevant to his defense that the correctional officers in this case attacked him in retaliation for the *Armstrong* lawsuit.

Defendant next argues that because the evidence was highly relevant, the risk of confusion did not substantially outweigh the orders' relevance, and the trial court thus erred in excluding them under section 352. As we have already agreed with the trial court that defendant has failed to show the orders were relevant to his defense, we need not discuss defendant's additional arguments based upon the same premise.

Defendant also contends the court erred in excluding the evidence under section 1101 because, he argues, that statute is not

16

relevant to this situation.[4]  He reasons the statute is not relevant, as he merely intends to show that "because of prisoner complaints, the CDCR was required to take certain actions which clearly did not reflect positively on the guards as a whole."  Defendant argues this would show why guards in general would be motivated to retaliate.  Even if *Armstrong*'s findings of fact and conclusions of law were probative of such a contention, defendant has not made any offer to prove that all, some, or any prison guards in the California prison system have knowledge of *Armstrong*'s findings of fact and conclusions of law; nor has he made any offer to prove that any guards thought ill of *Armstrong*, or that any of them harbored a retaliatory motive as a result.  Thus, even if we agreed that section 1101 had no relevance to the trial court's determination, defendant's argument provides ample demonstration of the irrelevance of the orders to his defense.  As we have found the trial court's ruling correct on that ground, we need not further discuss defendant's argument.  (See *People v. Brooks* (2017) 3 Cal.5th 1, 39 [we affirm the ruling if correct on any ground].)

As defendant's arguments have failed to produce facts showing the relevance of the orders and he has failed to demonstrate the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner, we find no error or abuse of discretion.  (See *People v. Battle*, *supra*, 11 Cal.5th at p. 799.)

Further, defendant has not met his burden to demonstrate a miscarriage of justice.  (See § 353, subd. (b); Cal. Const., art. VI,

---

**4**      Section 1101, subdivision (a) provides that with exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

§ 13.)  Defendant acknowledges the test for prejudice is the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, under which error is harmless unless it is " 'reasonably probable' " that defendant would have achieved a more favorable result in the absence of the error.  It is the defendant's burden to demonstrate the reasonable probability of a different result.  (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746.)  Defendant's showing consists of arguing the orders supported his theory that the guards were motivated to retaliate against him, followed by his conclusion that had the evidence been admitted, it is reasonably probable that the jury would have reached a more favorable verdict.  As we have already found the evidence was not relevant to prove his theory of defense, we reject defendant's conclusory prejudice argument.

## II.  Character evidence

Defendant objects to testimony elicited by the prosecutor that was inadmissible "character evidence" under section 1101, subdivision (a).[5]

During direct examination of Officers Morataya, Martinez, Davis, Rodriguez, Castellanos, and Doty, the prosecutor asked questions regarding their reliance and that of their families on their salaries, healthcare benefits, and pension; whether they could be fired for lying in a police report; whether they knew the consequences for perjury; and whether they would risk that by beating defendant and testifying falsely about it.  Defendant made no timely objection on the ground advanced here and did not object at all to most of the questions.

During such questions to Officer Morataya (which covered four pages of reporter's transcript) there were two objections.  After

---

[5]    See footnote 4.

18

the prosecutor asked whether his wife and children hoped to live on his pension after he retired, defense counsel objected on relevance grounds. The objection was overruled. After Officer Morataya testified that he could lose his job for lying on a police report, the prosecutor followed up with, "So you could get terminated at CDCR?" The trial court sustained a defense objection as to leading.

In the three pages of questions put to Officer Martinez, when the prosecutor asked, "If you commit perjury yourself, you are aware you could be convicted and go to prison, right?" Officer Martinez replied, "Yes," and the trial court sustained a defense objection as to leading. There was however, no motion to strike the answer. The prosecutor then asked, "What if you saw another officer [commit perjury and assault and battery just to get defendant], would you just come into court and lie for that officer?" The court overruled the defense objection made on the ground the question called for speculation.

When the prosecutor asked similar questions of Officer Davis, there were no objections. When similar questions were posed to Officer Rodriguez, defense counsel objected on relevance grounds to the question, "Do you get a pension?" The objection was overruled. Finally, when the prosecutor asked similar questions of Officer Castellanos, there were no objections.

We agree with the People that defendant has not preserved this issue for review. A challenge to the admissibility of evidence is generally not cognizable on appeal in the absence of a specific and timely objection or motion to strike the evidence in the trial court on the ground urged on appeal. (§ 353.) An objection on one ground does not preserve a challenge based upon a different ground. (*People v. Partida* (2005) 37 Cal.4th 428, 434–435.)

19

Defendant asserts that an objection would have been futile and asks we excuse his forfeiture. Defendant suggests futility is shown by the trial court having overruled two relevance objections during the officers' testimony that defendant now challenges under section 1101. As the People point out, defendant made few objections at all and gave the trial court no opportunity to make a ruling which might have suggested that any objection on the issue of character evidence would be overruled. Such circumstances do not demonstrate futility. (Cf. *People v. Redd* (2010) 48 Cal.4th 691, 745 [defendant objected to only six of the 18 challenged instances and none of the objections was made on the ground urged on appeal].)

Defendant also suggests futility is shown by the denial of defendant's later motion for reconsideration of the overruling of various defense objections, including defendant's relevance objections to questions regarding the consequences of perjury and filing false police reports. Defendant did not seek reconsideration on the ground urged here; and he fails to provide a legal argument, or any reasoned argument, to explain how the denial of a motion to reconsider an objection on a ground different from that urged on appeal would demonstrate the futility of making a specific and timely objection on the appropriate ground.

In addition, defendant's argument on the merits consists of his opinion the prosecution's purpose was to show the guards were upstanding, moral people who would not act inappropriately on the job, followed by defendant's conclusion the officers' testimony challenged here "is exactly the type of evidence that Section 1101 seeks to exclude." Defendant fails to cite any authority other than section 1101 to support his conclusion. He also fails to make a legal or any reasoned argument to demonstrate the challenged testimony

20

was inadmissible character evidence. Where a defendant provides no legal analysis to support a point raised, or presents an undeveloped argument, the reviewing court need not discuss the issue and may treat the issue as waived. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363; *People v. Medrano* (2008) 161 Cal.App.4th 1514, 1520.)

Defendant provides an equally undeveloped prejudice argument when he asserts the officers' testimony created a false inference that the guards would not have initiated the incidents in retaliation for defendant's involvement in the *Armstrong* lawsuit that adversely affected defendant's credibility. Although defendant acknowledges we review the exclusion of evidence for an abuse of discretion and apply the *Watson* test to determine prejudice, he concludes without further argument that without this evidence, there would be a reasonable probability that the jury may have reached a different verdict. (See *Watson, supra,* 46 Cal.2d at p. 836.) However, defendant makes no mention of the trial court's finding when it denied his motion for reconsideration, "Given the fact that the Court is allowing *Pitchess* witnesses to impeach the credibility of these same witnesses, there is no prejudice to Defendant in allowing this line of questions."[6]

---

[6] See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. A *Pitchess* motion "allow[s] criminal defendants to seek discovery from the court of potentially exculpatory information located in otherwise confidential peace officer personnel records. If [the moving] party . . . makes a threshold showing, the court must review the records in camera and disclose to that party any information they contain that is material to the underlying case. (See Evid. Code, §§ 1043, 1045.)" (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 705; see also Pen. Code, §§ 832.5, 832.7, subd. (a).)

Given defendant's failure to provide a reasoned argument or relevant authority for any of the points made relating to his character- evidence claim, it is deemed waived and forfeited.

## III. Cumulative prejudice

Defendant contends that reversal is required due to the cumulative prejudice from all the errors he claims to have established. Because we have rejected defendant's claims of error and have found none of the alleged errors to be prejudicial, we reject defendant's claim of cumulative prejudice. (See *People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## IV. Penal Code section 12022.7 enhancement[7]

Defendant contends that although the trial court was authorized to dismiss or strike the great bodily injury enhancement found true as to count 3, it was not authorized to stay the enhancement. The People agree, but the parties disagree whether this court should modify the judgment by striking the enhancement or by remanding the matter to the trial court to exercise its discretion.

Section 1385, subdivision (a) permits a court to strike or dismiss an enhancement in furtherance of justice. (*People v. Barber* (2020) 55 Cal.App.5th 787, 814.) Subdivision (b)(1) of section 1385 also permits the court to strike the additional punishment provided by an enhancement.[8] "There is nothing in the language of section 1385, which permits a 'stay' of all or part of a sentence." (*People v. Calhoun* (1983) 141 Cal.App.3d 117, 125.) As such, an

---

[7] All further unattributed code sections are to the Penal Code unless otherwise stated.

[8] Exceptions set forth in section 1385 which are not relevant to our discussion are not enumerated here.

22

enhancement should be stricken, not stayed, if the court chooses not to impose it. (*People v. Jones* (1992) 8 Cal.App.4th 756, 758; but see *People v. Lopez* (1983) 147 Cal.App.3d 162, 165.)

Defendant asks this court to modify the sentence to dismiss the great bodily injury enhancement, arguing we need not remand for the trial court to exercise discretion, because the court made clear that defendant would not serve the three-year enhancement under section 12022.7. Defendant relies on *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391, which held: " 'A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]"

The trial court here was unaware that its discretion did not extend to staying the section 12022.7 enhancement. However, the record clearly indicates that the trial court intended to impose an aggregate sentence of about six years, as there was much discussion with counsel as to how to fashion the sentence. The court finally settled on a sentence that would result in a six-year commitment by staying the term on count 6. The court restated the sentence without changing the orders dismissing enhancements, including the great bodily injury enhancement, which it had already pronounced.

The People argue that the matter should nevertheless be remanded for two reasons: (1) because the trial court did not make clear its finding that dismissal of *some* of the enhancements would

23

not endanger public safety applied to the great bodily injury enhancement as well as the other enhancements; and (2) because the court failed to state the reasons for staying the great bodily injury enhancement.

The court is required to orally state its reasons for a dismissal on the record.  (§ 1385, subd. (a).)  Here the court stated:  "The great bodily injury enhancement shall remain but as set forth later, will be stayed."  We agree that the trial court did not *later* set forth reasons for the stay; however, the reasons appear earlier in the sentencing hearing when the court agreed with recommendations in the prosecution's sentencing memorandum.  The memorandum urged the court to strike the punishment for the great bodily injury enhancement while keeping the conviction (apparently meaning its true finding of great bodily injury).  In addition the prosecution gave the reason for doing so, and for striking other enhancements, was to encourage rehabilitation with the possibility of eventual release, that a longer sentence in addition to his current commitment would likely eliminate that possibility.

The trial court agreed.  The court acknowledged defendant's lengthy criminal history, and noted under his current commitment he would not be eligible for parole until he reached 67 years old. Defendant would have no incentive to rehabilitate if he faced a new sentence that would effectively guarantee he would die in prison. The court therefore struck defendant's serious or violent prior "strike" convictions and as well as such felonies alleged under section 667, subdivision (a) which were more than five years old. The court then stayed the great bodily injury enhancement.

In light of the proceedings just summarized, we find the trial court did in fact give reasons for its treatment of the great bodily injury enhancement, but was mistaken in how to strike the

24

enhancement while keeping the conviction and the true finding of great bodily injury.

With regard to the People's public safety argument, section 1385, subdivision (c) requires the court, when dismissing an enhancement in furtherance of justice, to consider, and give great weight to certain circumstances in mitigation unless the court finds that dismissal of the enhancement would endanger public safety. However, striking the punishment is governed by section 1385, subdivisions (a) and (b)(1).  The People have not provided any authority with extends subdivision (c) to the striking of punishment under subdivision (b), and we have found none.

We thus find the appropriate remedy is to vacate the order staying the section 12022.7 enhancement and replace it with the order intended by the trial court.  As there is no need to remand, we will exercise our power under section 1260 to modify the judgment, and defendant's sentence will remain the term intended by the court.  (Cf. *People v. Ledbetter* (2014) 222 Cal.App.4th 896, 903–904 [appellate court vacated finding that Tennessee offense was a serious or violent felony conviction]; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473–1474 [appellate court modified section 654 stay to correct failure to impose term before staying].)

## DISPOSITION

The judgment is modified to vacate the stay of the Penal Code section 12022.7, subdivision (a) enhancement imposed as to count 3, and to instead order the additional punishment imposed due to Penal Code section 12022.7, subdivision (a) be stricken. The trial court is directed to forward to the Department of Corrections and Rehabilitation a new abstract of judgment reflecting this modification.

In all other respects, the judgment is affirmed.
NOT TO BE PUBLISHED.

_____

CHAVEZ, Acting P. J.

We concur:

_____

HOFFSTADT, J.

_____

KWAN, J.*

---

* Judge of the Superior Court of Los Angeles County under appointment by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26